## MURCHISON v. HARDIN et al.
### No. 2926.

Court of Civil Appeals of Texas. El Paso.
Feb. 15, 1934.

Rehearing Denied March 15, 1934.

Second Motion for Rehearing Denied March
22, 1934.

Toddie L. Wynne, Jack T. Life, and Wynne
& Wynne, all of Athens, for appellant.

Bishop & Holland, of Athens, for appellees.

PELPHREY, Chief Justice.

On March 9, 1931, a note for $3,000, payable to the First State Bank of Murchison, Tex., was executed by J. T. Hardin. R. E. Saxon's signature also appears on the note. The note matured on December 31, 1931, and, as far as the record here shows, was never renewed. On May 17, 1932, the bank assigned all of its property, both real and personal, to the Henderson County Investment Company, a corporation, it being agreed that the Henderson County Investment Company should pay all the bank's indebtedness, except $7,300 due the Federal Reserve Bank at Dallas, and $10,000 due the Reconstruction Finance Corporation. Listed among the assets of the bank was the above-mentioned note. On the same day the Henderson County Investment Company assigned to appellant here all of its property upon the consideration that he would assume and obligate himself to pay to the individual depositors of the First State Bank of Murchison their individual deposits amounting to $52,872.47, less $9,487 paid to certain depositors for stock in the investment company and $7,395.13 due the Federal Reserve Bank of Dallas. In this assignment it was agreed that, in the event a sufficient amount of money was collected from the assets to pay Murchison his indebtedness together with the expenses incurred in the handling and collection of such assets, then the remaining portion of the properties was to be returned to the investment company.

January 24, 1933, Murchison filed this suit, upon the note above mentioned, against Hardin and Saxon, seeking to recover the sum of $3,000 principal, $324.17 interest, and $332.41 attorney's fees.

Hardin and Saxon, in answer to the suit, alleged the Henderson County Investment Company to be the owner of the note and that it was a necessary party to the suit to collect same; that Murchison was not the unconditional owner of the note, and that, if

he had any interest in the note, which was denied, it was only as a lienholder.

Saxon further alleged that he signed the note solely for the accommodation of the First State Bank of Murchison at the request of and with the distinct understanding between him and the active vice president and cashier of the bank that he would never be called upon to pay it; that no consideration or benefit ever passed or accrued to him or to any other person except the bank; that he signed the same at the request of the bank after it had been executed by Hardin in payment of a prior debt of Hardin which had not been created at his instance.

He then alleged the conveyance by the bank of its assets to the Henderson County Investment Company; the assignment thereof to Murchison; that the property so assigned greatly exceeded in value the liabilities of the bank; and that the Henderson County Investment Company was the actual and beneficial owner of the note.

In reply, Murchison generally denied the allegations of Saxon's answer, specially denied that he was an accommodation maker of the note, and alleged that Hardin had, prior to the execution of the note sued upon, been indebted to the bank; that the bank had refused to renew the note for Hardin without additional security; that thereupon Saxon signed the note with Hardin and by so doing induced the bank to renew the same. '

Murchison also specially pleaded that Saxon had at all times recognized the note as his obligation and by his acts and conduct in dealing with the note and in dealing with the public with reference thereto had estopped himself from pleading a lack of consideration therefor. The several facts depended upon as constituting estoppel were pleaded with particularity.

The Henderson County Investment Company intervened, adopted the pleadings of Murchison, and prayed that, in case the court should not find for Murchison, judgment be rendered in its favor against appellees.

Saxon by supplemental answer excepted to the pleas of estoppel.

At the conclusion of the testimony the court instructed the jury to return a verdict in favor of Murchison against Hardin, but in favor of Saxon.

From a judgment that Murchison recover $3,656.58, as against Hardin, and take nothing as against Saxon, Murchison has appealed.

## Opinion.

The circumstances surrounding the signing of the note by Saxon were detailed by the witness Asher, who was vice president and cashier of the bank as follows:

"Q. Mr. Asher, I will get you to detail what happened with reference to the procuring of the signature on the note that is involved in this suit? A. Well, to the best of my recollection, the note had been criticized by the Examiner, as being spurious, insufficiently secured, 'the J. T. Hardin note, and I had promised him when we renewed the note we would get some additional security. And so, I had Tom Hardin come in the office, and told him we would have to get it better secured if we carried it on our books, if we didn't we would have to charge it off the books. We discussed how he could secure it, and possibly I suggested he might get Mr. Rube Saxon to indorse the note with him, if he could it would be all right, and either Mr. Hardin or myself 'phoned Mr. Saxon, and later on he came in the Bank. And I don't know whether Mr. Hardin did any talking, or I did the talking—It is my recollection that I did the talking, explained to Mr. Saxon the condition of the note, and if we carried it that it had to be better secured, if we carried it on our books, or we would have to charge it out, Mr. Saxon hesitated about signing the note. I was anxious to get it signed, and I encouraged Mr. Saxon to sign the note, told him I believed it would work out, and would be paid. And in our conversation, my recollection is, I told Mr. Saxon that so long as I had charge of the Bank we wouldn't press him, or be hard on him, and we would carry the note along and give Mr. Hardin a chance to pay it, and if it should happen that he had the note to pay that I would see he didn't lose anything, personally. My reason for that was that I knew under conditions, the sentiment in connection with the closing of the Bank up here, and interlocking stock, if we had any kind of confusion it would mean the loss of our depositors and every thing else, and I was willing, if he was forced on the payment of the note, I would make it good as far as my ability.

"Q. Tell what was said, near as you can remember, with reference to the probability that the Bank would be examined in a few days, on account of the Bank here failing, and the connection between the two? A. Well, I told Mr. Hardin, I am sure I told Mr. Saxon, that the note would have to be secured, or we would have to charge it out

upon examination, because it had been criticised, and if it wasn't secured properly, it would have to be charged off."

Mr. Saxon's version of the signing was: "Mr. Asher says: 'Rube, you know that Athens National Bank closed their doors, they are not opening up this morning, and we being a branch bank of the Athens National Bank, I am expecting the Examiner down here any day, right away, at least, we will have an Examiner down here, and the business of the Bank is not in condition for an Examiner to come down and examine it.' Of course I didn't know anything about banking, never had any experience, all I ever knew about a bank was my deposit and checking on it, such as that, never had any experience in the working of a bank, or anything, didn't know anything about it. He says: 'The Bank is not in any condition to stand an examination.' And he went on and stated that he had—He said, tho, he made the statement, I had some money in the Bank at the time, he said: 'I don't want you to get excited, or anything of that kind,' and he said: 'I have got a note here on Tom Hardin, that I want you to sign.' I said: 'How much is the note?' He said: '$3,000.00.' I said: 'Good God, man, I can't do anything like that.' He said: 'Now, wait, before you say that, if you will sign this note, Rube, I don't know of anybody else that I could get that would do that, and I am asking you as a friend, I want you to save the Bank, and if you will sign this note I promise you this, as long as I live you will never be bothered on this note.' And he so insisted and kept on insisting that I finally signed the note under those promises."

J. T. Hardin testified:

"Q. Now, I am going to get you to detail the jury, as you remember it first telling the time of day, just what conversation took place between you and Mr. Asher, with reference to your $3,000.00 indebtedness owing to the Bank? A. Well, he called me down to his office, to the Bank, early one morning, before sunup, before daylight."

"Q. Was that on March 9th? A. Yes, sir. And he told me that there had to be something done about my note, that the Athens National Bank had gone under, and he was looking for an Examiner, and said it had to. be fixed some way or another, and I had no other way of fixing it, other than what I had up as security, and I told him I had no way of fixing it, he said: 'Well, get Rube Saxon to sign that note. I said: 'Marshall, I don't want to ask Rube to sign that note.' He said:

'Call him down here and we will talk to him about it.' And I called Rube and he came down and Marshall talked to him about the note. * * *"

"Q. What took place when Mr. Saxon came down there? A. Well, Marshall just told him the shape the Bank was in.

"Q. Detail the exact language used, near as you can remember it? A. Well, he just said: 'Rube, the Bank is in bad shape, and Tom has got a $3,000.00 note here, and I believe they are going to close me if I can't get it fixed some way,' and said: 'I want you to sign the note.' And Rube hesitated about signing it, but he later signed the note."

"Q. What else, if anything, Mr. Asher said to him about it? A. Well, he told him, Rube didn't want to sign it, and Marshall told him that he would see he never had to pay the note. Said if he would sign it that he would see that he wouldn't never have it to pay. * * *"

"Q. Did you ask Mr. Saxon to sign that note? A. No, sir.

"Q. Did you want him to sign it? A. No, I didn't, for I didn't know when I could pay it, if I ever could."

He testified further on cross-examination:

"Q. And when Mr. Asher called you down there did he tell you what the Bank Examiner had said about your note? A. The morning he called me down there, yes, sir."

"Q. He told you that the Bank Examiner told him that note would have to be further secured, did he? A. Yes, sir.

"Q. Told you if it was not further secured that the Bank Examiner was going to make them take it out of the Bank, didn't he? A. No, he told me that if that note wasn't fixed the Bank would have to close. * * *"

"Q. And he suggested to you that you get Mr. Saxon to sign the note? A. Yes, sir.

"Q. You did call Mr. Saxon, didn't you? A. Yes, sir.

"Q. Mr. Saxon came down there, didn't he? A. Yes, sir.

"Q. At that time Mr. Asher told Mr. Saxon just what he had told you, didn't he? A. Yes, sir.

"Q. He told him that the note would have to be renewed, with additional security or the Bank was going to have to close? A. Yes, sir."

It also appears from the record here that, within a few days after Saxon had signed the note in question. he. went to Asher and

tried to get his name off the note; that Asher then entered into an agreement with him to deed him his (Asher's) home as a protection against loss resulting from the signing of the note; that later a deed to the property was executed by Asher and his wife, and some time thereafter Saxon deeded the property back to them, and they executed $1,500 in vendor's lien notes payable to Saxon, which notes he still held at the time of the trial. It further appears that Hardin transferred his life insurance policy to Saxon as an added protection to him.

From the above-quoted statements of those present when Saxon signed the note, we think it clearly appears that he signed the note as an accommodation to the bank. The fact that he was a depositor of the bank at such time, and that he might have sustained some loss if the bank had closed, would not be sufficient consideration for the execution of the note by him; especially would this be true, where there is not even a hint in the testimony that in signing the note Saxon had in mind the protection of his deposit.

The character of accommodation paper is not changed by the fact that the accommodation party has taken security for the loan of his credit, 8 C. J. § 402, p. 255; therefore, the rights of the parties here are not affected by the fact that Saxon took the deed from Asher and wife and the transfer of the insurance policy from Hardin.

It is well settled that an accommodation party is not liable to the party accommodated, 6 Tex. Jur. § 106, p. 726; First National Bank v. Winfree (Tex. Civ. App.) 24 S.W.(2d) 768; Central Nat. Bank v. Lawson (Tex. Com. App.) 27 S.W.(2d) 125, affirming (Civ. App.) 7 S.W.(2d) 915; nor to one who holds merely the title of such party, First Nat. Bank v. Chandler (Tex. Civ. App.) 58 S.W.(2d) 1056.

In the case at bar the Henderson County Improvement Company received the note here sued on after it was past due, this fact appearing from the list attached to the transfer.

The note was also past due when Murchison acquired title to it.

These facts being true, the note was subject to any defense which might have been urged against the bank, one of which being the defense of accommodation maker. As against Murchison, Saxon had a good defense, unless by some act of his he has estopped himself from asserting it. Murchison testified that he discussed the note in question with Saxon before the depositors were paid, and admitted that Saxon told him the circumstances under which he signed the note. Murchison therefore knew that there was no consideration paid to Saxon for the execution of the note, and that as matters then stood Saxon was not liable.

Murchison was not induced to purchase the note in question by any concealment or representation as to the note sued on or the facts surrounding its signing by Saxon; therefore, there arose no estoppel in favor of Murchison.

The promise which Murchison testified Saxon made that in the final analysis he would pay the note was without consideration and, consequently, cannot become the basis of a recovery.

Under the facts we think Murchison was the proper party plaintiff, and that the Henderson County Investment Company was not a necessary party to the suit.

We feel that what we have said disposes of the various questions presented, and that all of the assignments should be overruled.

The judgment is affirmed.

### On Motion for Rehearing.

Appellant in his motion for rehearing questions our holding in the original opinion that the evidence showed Saxon to be an accommodation maker of the note in suit, and refers us to the testimony of Saxon appearing on page 152 of the statement of facts.

We were fully aware of the testimony now referred to, but concluded then, and are of the opinion now, that the statement of Saxon had no reference to the execution of the note and his purpose or thoughts at that time.

The statement made by Saxon, as we understand it, referred to what he was thinking on May 7, 1932, and not on March 9, 1931, the date on which he signed the note.

With this explanation we think the motion for rehearing should be overruled.